Okay, with the lawyers who are going to argue, approach the bench and introduce yourself to the court. Good morning, Your Honors. Melinda Cole-Ross on behalf of Dean Transportation, Inc. Luca Horowitz on behalf of Sherry Miyagi. Okay. Now, the appellant, are you going to like how much? Eight minutes. Okay. Justice McBride is on this panel, but she won't be able to be here today, but she will listen to the tapes, and she'll be involved in the decision-making process. Okay, let's proceed. May it please the court, counsel. Again, my name is Melinda Cole-Ross on behalf of the defendant, appellant, and Ross Eppley, Dean Transportation, Inc. This case involves a $7.3 million future medical expense award that the trial court remitted by $3.65 million, leaving a $3.65 million future medical expense award. The plaintiff... If I can interrupt you for a second. Yes. So how did the, you agree that the standard here is abuse of discretion. Yes, it is. So how did the trial court abuse his discretion? It didn't enter a substantial enough remitter. We agree that a remitter was absolutely required on the evidence, but we think the amount should have been greater because the evidence is insufficient to support even a $3.65 million future medical expense award. Well, what do you think the remitter should be? We think it should be down to a maximum of $100,000, which was the requirement, and we believe that the evidence in the record... What case law ever said that a jury has to, can't give a plaintiff more money than they ask? The cases don't say that they can't, but it still has to be supported by the evidence. Okay, well here, I'm going to This accident happened in 2012. The case went to trial in 2016. Is that correct? Yes. The verdict was entered in 2016. Yes. So there was a four-year period of time. Yes. During that four-year period of time, the plaintiff sustained $300,000 in medical expense. Is that correct? That's correct. Stipulated too by the parties. Yes. Now, we've already read the records, so we know all about the case. Sure. Okay. And if you took that $300,000 figure over four years, it would be $75,000 a year. Is that correct? I think it would actually be about $66,000, but yes, you're in the ballpark. Close enough. You're in the ballpark, sir. Okay, I'm in the ballpark. All right, and this lady had a life expectancy, according to the evidence in this case, of another 49 years to live. Is that correct? That's correct. So if you took the figure of $75,000, or even if you say that's a little high, any figure, and multiply it by 49 years, you're going to come out to exactly what this judge did. That's true, but you have to look. If we didn't know about the past and the future medical treatment, you could do exactly that calculation. We'd have a very easy case. But here, plaintiff's medical witnesses testified to her prior medical treatment, which involved all sorts of procedures that weren't going to be done going into the future. Her medical treaters, three of them, very clearly... Well, here, let me stop you on that. Yes. There was evidence that in the future, she could have physiotherapy. Would you agree to that? Yes. There was testimony that if she could tolerate it, yes, physical therapy. There was evidence that in the future, she was going to have various surgical procedures to put in that device for the pain. No, not in the future. She already had those. Those were in the past. Well, I know, but it had to be changed over period. Just the battery, not the implantation of the device itself. Well, it's still a surgical process. Yes, but a minor surgical procedure. Yes. And even a minor surgical procedure requires some post-operative work, whatever it is. Well, I'm not sure that that's on par with... The doctor self-characterized it as a very minor procedure compared to the implantation, the original implantation. And reading the record and reading the testimony of the doctors, that's what I seem to obtain from that information. So, and she's going to have pain pills for the rest of her life. Yes, we agree on that. And these are the same things, basically, that comprise the $300,000? No, they're not. You have to recall, before she had the spinal cord stimulator implanted, she went through a whole course of treatment trying to ameliorate her pain symptoms. She had all these nerve block injections. She had these nerve ablations. She had a trial spinal cord stimulator to see if it would be helpful when it was. Then she actually had the permanent implantation. Those things are not going to happen again. Once she has the device implanted, no more nerve block injections, no more nerve ablations. You're not going to do a trial again because the device is already in her. And you're not going to do an implantation again because it's already in her. So we have got a very different future medical expense course than we did for past medical expense course. Can I ask you, where in the record is there any indication or evidence regarding specific medical costs as to future medical? The plaintiff did not introduce any future medical expense evidence. So what we have here is a record that shows the past medical expenses for her pain medication, which is one of the categories her treater said she would need into the future. That was approximately $500 per visit. That's what her own treaters and experts said she would require. Those costs were between $138 and $339 per visit. Again, that evidence is in the record and is cited in our brief. If you multiply that out times her lifespan, you'd be looking at a low end of about $6,700, a high end of about $16,900. So you've got very small future medical expenses. And I agree, you've got the wild card of the spinal cord battery replacements and maintenance. But even if you took the cost, and we do have in the record, the cost of the implantation procedure itself was under $112,000. If you look at the appendix at pages 80 to 81, so even if you said, well, she's going to need five or six battery changes, and you say, they're going to cost as much as the complete implantation, you'd be looking at about $500,000 plus $25,000, plus we'll give her the high end of $16,000. You'd be looking at under $600,000. So in rendering our decision here, should we or can we consider the amount of medical bills that weren't submitted to the jury, or are we bound by what was stipulated to by the parties here? I believe you can look beyond it because the trial judge... Sorry, beyond what? The stipulation? The trial judge looked at the basis for the stipulation, which was plaintiff's answers to interrogatories, which had the medical bills, and he looked and he said, this award is excessive. There just isn't evidence to justify this. And if you're looking at whether he exercised his discretion appropriately or not appropriately, I believe you are entitled to look at that evidence as well. But you're referring to bills and costs that weren't submitted to the jury. That wasn't submitted to the jury, and it is Dean's position that that was plaintiff's burden, where you had medical evidence that was submitted to the jury, that plaintiff had a different and far more extensive course of treatment prior to the spinal cord stimulator device being implanted, and then there is evidence from her own witnesses, she's not going to need those procedures again. She's going to need future pain medication, future pain medication doctor visits, and just battery changes and maintenance on the implanted device. So you've got two different categories, past treatment, future treatment. Plaintiff had the obligation to come in and show what the cost of that future treatment was because by their own witnesses, it was different. If it was the same, I agree you could just use the stipulation and say, well, we had that before, we have it in the future, there's your evidence. But her treaters defined a completely different course of treatment going forward than what had happened in the past. And there was extensive testimony walking the jury through all these things that had been done, these nerve block injections, these ablations, a trial implantation, the permanent implantation, so the jury was well aware they received all of that evidence, and then they heard, what will Ms. Miyagi need in the future? Pain medication, pain management doctor visits, battery changes and maintenance for the implanted device. Those two things are not the same. So it was the plaintiff's obligation to parse out how much for the future because it didn't match what was in the past. And I believe if you look at the remittances that we've cited in our brief, most importantly, Richardson, you don't have the kind of leeway to enter a $7.3 million award or even the remitted $3.65. We've got an analogous situation there. We had a quadriplegic, a 23-year-old quadriplegic plaintiff in Richardson, and there was evidence that she was going to need some items that they didn't provide a medical cost for. Hospitalizations, a modified van for transportation, wheelchair. The court said, well, the jury awarded $1.5 million for these items, these unallocated items. That's too much. We're going to remit it down to $500,000. That's as much as we can give on the evidence that still has a basis while affording the jury some leeway in making that type of determination. And if you apply that same reasoning here, as I think we must where we have no evidence regarding these costs that went to the jury, then you have to say that even the $3.65 million remitted amount is just too high. And when we look at the other remitted cases that we have, the holdings are in line. Well, let me ask you, you cited Brianti v. Link. Yes. Are there any other courts following that case? That was from 1989. I do have some cases. It's been followed as far as the principal, but they looked at the evidence and said, in that case, there was a $34,000 remitted. So you're talking about a pretty small amount. The court said, well, physical therapy is so easily itemized. You could have calculated the number of visits, how much they cost. It's not like pain and suffering or disability that you can't put a price tag on. So that you should have plaintiff, you should have put in that evidence if you wanted to collect for it, and they remitted $34,000. I'm not saying that they needed to be that exact. If they said she needs pain medication, I think that's enough, even though they didn't put in the dollar amount. But it's not enough to give $3.65 million or $7.3 million. And if you look at the cases, including the first district cases that we've discussed in our brief, where a remitted or wasn't required, the numbers are so much smaller. We're talking about $150,000 of future meds, $200,000. They're very small amounts, both in comparison to the prior medical expenses and just in general when compared to this award. We don't have any Illinois case saying that on this type of evidence where you don't introduce dollar amounts and you've got narrowly defined categories of future medical expense that the treaters have attested to, that you can have a multimillion dollar award stand. That is far beyond the sum leeway that Richardson said was acceptable. And for those reasons, we would ask that a further substantial remittiture be entered or a new trial on future medical expense damages be granted. Let me ask you this. Yes. Do you think a plaintiff has to present evidence of present cash value of future medical expenses? They don't have to present the evidence. The case law says they don't. However, as a practical matter, normally when you have a multimillion dollar future medical expense award, you're probably going to have some sort of a life care plan, a very detailed numbers provided to substantiate that. You usually will have an economist of some type come in to reduce it to actual cash value to assist the jury if you're working with those kind of numbers. Frankly, we weren't working with those kind of numbers here. That's why the plaintiff only requested $25,000 to $100,000 for future medicals. The bulk of this case was about non-economic damages. We firmly believe that if this was a multimillion dollar future medical expense case, there would have been detailed itemization of the dollar amounts, and an economist would have come in. It's not required. I will concede, but that is, as a practical matter, what would have been done. And certainly the plaintiff wouldn't have blackboarded $25,000 to $100,000. Those numbers are right in line with the evidence and the calculations that I'm talking about. They're not in line with $7.3 million or even a remitted $3.65 million. Thank you. Thank you. I would go to the basic black letter law in this, which each of the cases say, which is future medical expenses will be inferred from the nature of the injury. From the nature of the injury. If the case is defendant-sided, there is a projection, testimony as to what the future medical expenses will be. In our case, there is none. What case holds that it's the nature and extent of the injury? Lewis v. Cottenbelt. Prugin. It doesn't say that that's the only factor. What, in fact, Prugin went on to say the risk of development of other conditions was a factor that goes beyond that, which is very important in this case. And in Lewis, they awarded ten times the amount of past medical, which is basically what the judge remitted this award to, and that was found to be proper. Mind you that when the jury looks at the inferred based on the nature of the injury, this is a devastating, devastating medical condition. This is a lady who lives with burning pain in her legs every day, never gets less than a five, basically confined to her bedroom. This is a lady who was very active. She can't have her sheets touching her legs. She vomits because of the pain. She's got a devastating. How about the fact you only asked for a small amount of money for future medical and the jury gave an overwhelming amount? What do you have to say about that? Yeah, well, I mean, as is frequently the case, we see it differently than the jury, and this was the case with defendants. We saw it as an incurable condition that she was going to be devastated for life 50 years. Well, you saw it as a case where it didn't justify a lot in future medical. Right. Not that it didn't justify it, but that we thought that the case was more about that there wasn't a cure. But mind you, the doctor testified when the defendant says these aren't repeating costs, it's just not true. The doctor testified that these implants that has to last now 49 years, that the implants can fray, they can fracture, they can migrate, they can move. What happens when that happens? All of it has to be redone. So the jury could definitely see new surgeries. There was a stipulated amount as to what this would be. In rebuttal, the defendant points out, we said the jury extrapolated, which is I got that right out of the case law. No objection. No objection at all. And this was a stipulated amount. This was never objected to until later. So how did the trial court abuse his discretion here? I mean, the jury rendered a verdict. There's a stipulation with regards to the medical expenses, right? And, you know, the judge heard argument on both sides with regards to the issue of the limiter and then made a determination based on arguments and the evidence that was presented and basically split the amount in half. So how did the trial court abuse his discretion? Well, the judge's line is outstanding, Judge. Our only position on that, and, look, we accepted the remitter, but our only position on that is we did the calculations. At that time, interest in the banks, if you remember at that time, we were getting about 0.5%. And medical inflation, the jury looked at it being 3% or 4%. That would have justified a $7.2 million present cash value award. And that's what we were thinking. And when you look at her condition being progressive, the fact that it's expanding throughout her body, it is moving from leg to leg, and it's continuing to move. Being progressive means the jury is looking at her future, and when they decided she's going to get $10 million, they decided to break it down. Because, if you remember, the medical amount was an uneven number. Everything else was this even number, $200,000, $800,000. But the medical amount was $7.3. So, obviously, it can't be the jury's mind. But, obviously, they decided to put everything that they felt the solution for her into the medical, and they could do that when someone's going to have a devastating future with nothing but progressive. And, mind you, the defendant added to this when they had their expert testify that she had an opioid-induced hyperalgesia and a nerve injury. So, according to him, the injury, the treatment to the injury, is causing her even more pain. And now, what do you got? Now you've doubled up on the problem if the jury believes the defendant expert and they believe the plaintiff's treaters and experts. So the question is whether a jury can take a stipulation, take repetitive treatment, take non-objective-to extrapolations and extrapolate. Yeah, but counsel argues that if you took the medical expenses and you took what would be reoccurring, it's nowhere going to come out to the remitter. Well, if we could go back after trials and bring in evidence that wasn't presented to the jury, we would change results all the time. I mean, this was not presented to the jury. The defendant is telling me it's $500 for morphine a year. It's $500. I don't know where they get this number, but let's just not act. It's probably $500 a week or a month. But regardless, when I expressed that these things deteriorate, fray over time, when the doctor talked about the risks, and that's why I said that Bruggen case, the risk for development of other conditions was important. If the jury believes that these will fray, these will migrate, this spinal cord stimulator in the neck will migrate over time, then they have every right to award based on the risks, and based on the risks she had, based on her physical condition, I'm thinking the jury's thinking a lot of things regarding the medical. Because you've got to remember, none of the cases that have been cited by anybody talk about a progressive, devastating condition. You know, they're talking about someone needs a future ECG. This is different. This is a while of being devastated. That's why we asked for $20 million, and I think the jury intended to give $10 million. But, you know, how they broke it up was how they decided to do it, and I think that should add deference. So the remitter here is only on the future medical, and I mean the cases indicate that trying to make a determination on future damages, there's a lot of uncertainty here. So, again, based on what the trial judge was presented, where is the abuse of discretion? You know, the judge has discretion. Am I going to say the judge acted, you know, there's some pretty tough language to defeat. Am I going to say the judge abused it? You know, that's a call for this court to make. Abusing means that no other judge would do that. Right. You know, you can't really say that, can you? I can say that. I think, you know, I have to agree that, you know, that I think it's arguable that the judge abused discretion. I think you have determined that. If I had someone in this condition or me in this condition, the jury awarded me $7.2 million. I would think the judge abused discretion. Based on what I'm going to have to go through for the rest of my life, and I have to be taken care of on a worsening condition, worsening condition is going to mean more and more treatment. More and more cures have to be determined. So what I do am very concerned about is the defendant's suggestion that it should just, if this court remitted it more or sent it back down to remit it more or whatever, that there should be just a future trial on medical expenses. That would be completely devastating because you take already two-thirds of the verdicts have been knocked out, and now you take the highest one and just say, well, the other ones had nothing to do with it. This is a pain case. This was all put together as one by the jury. They obviously went the medical route, you know, on this. They didn't go, let's give them a ton on pain and suffering and on medical. They didn't go there or a small amount of medical. They put this all together. This cannot be separated. So if it has to be remitted, it's got to be a new trial on damages. But the judge, I don't think, I think the judge made it clear he was not ruling that. He did not abuse his discretion in not holding that it should be a new trial on one element of damages. He made a suggestion that it could, if agreed to by the parties, of course, we didn't agree, but he didn't abuse his discretion there. And the defendant argued in its post-trial motions that it should be a new trial on all damages, that this was a passion and prejudice case. Then they changed their argument when the judge said, well, maybe you guys want to stipulate that this is a new trial on future medical. So they just changed their argument, and that really concerns me, that she could be forced into a new trial on, you know, a part of the case that, you know, I think warrants serious consideration by the jury of medical bills, but wasn't the reality of what happened here. They took this as a whole. This case is way too complicated. I mean, the jury wasn't mad at the defendant here. I read the record. I thought the defense did a very good job. I don't understand why the jury did what they did, but that's our jury system, you know. I think jurors are very hesitant to award money on non-economic damages, is my experience. They would much rather award on damages for, I mean, my personal opinion. They came up with an amount, and they spread it apart, and some jurors just won't award on non-economic damages and will award on medical bills. But if you look at that inherent test, whether it should be inferred from the nature of the injury, with this devastating injury, it's right in line with the other cases. It's just a devastating injury. There's no difference. And this is horrid. Anything else I can answer? Thank you very much. Thank you. You can't do what plaintiff just suggested. You cannot put non-economic damages for disability and pain and suffering into the future medical expense bucket. If that's what they did. We know that. If that's what they did, that's wrong. We know that. Okay. You also can't infer future medical expenses different than what the evidence showed. We weren't writing on a blank slate here. The jury was not writing on a blank slate. We're the medical treaters who are well aware. They're the ones who testified this is a progressive injury. She has mirror image spread from her right side to her left leg and foot. They said even with all that taken into account, this is their evidence, their testimony, here's what she's going to need. These three categories. We've done as much as we can with the spinal cord stimulator implant. Going forward, she needs more pain medication. And I have the medical bills. So where I'm coming up with $500 a year, that isn't off the top of my head. That's in the appendix to our brief starting at page 33. And it's record pages C859 through, let's see, about 16, I'm sorry, 859 through about 945. So we added all those numbers up. We didn't pull a number out of thin air. In Lewis, there was a third. Let me ask you this. Yes. I understand what you're saying. I've read the record. If I was the judge on this case, I might have done something absolutely different than this judge. But my job here and his job and Margaret's job is, our job is to decide whether this judge abuses discretion. In other words, he did something that no other judge would do. That's where the problem. We have to say that he did something that no other judge would do. I mean, I look at these cases. I defended cases for 18 years. And if I was on the other side here, I'd be screaming. Okay, I'd be screaming. No question about it. Sure. But the question is, can we say that no other judge would do that? Well, we submit that on this very extreme record that you can, just because the amount is so enormous. Where is the record extreme? What's extreme about it? Because if you look at all the other remitted cases we're talking about, like Lewis, you're talking about a $100,000 future medical expense award. You're not talking about a multimillion dollar future medical expense award where the treating physicians have defined these very limited categories of injury. And that's where we submit that the difference comes into play. I respect the standard of review, and I understand and respect your concerns with it. I just want to finish with one statement, which is that plaintiffs said we didn't object on rebuttal about his extrapolation argument. That was his rebuttal close. We didn't have an opportunity to attack that at the time. We let it go. We attacked it in the post-trial motion, and we argued it throughout. The cases in your hands, you have all the information of what future medical treatment was required, what dollar amounts we do and do not have in the record, and then whether Judge Lyons should be affirmed as to what he did or whether some more money needs to come off. And we leave that to your determination. So even though we didn't have the specific amounts or costs presented to the jury during the trial, there was clearly evidence that there was going to be future treatment that was going to be needed. Yes. The medical treaters were very clear on that. They're the ones who defined what this course of treatment was. We are not disputing she's going to have future pain and future loss of a normal life, but those are in the non-economic categories that the jury did award $2.5 million for. They're just not in the future medical expense bucket. Thank you, Your Honors. Thank you, guys, for giving us a very interesting case. The briefs were very well done. The arguments were very well done, and we'll take the case under advisement and give you an order or an opinion very shortly.